**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA
BATON ROUGE DIVISION**

| | | |
|---|---|---|
| COURTLAND GUILLORY,<br><br>Plaintiff,<br><br>v.<br><br>SPECIALTY WELDING AND TURNAROUNDS, LLC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 26-893<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Courtland Guillory files this Original Complaint against Defendant Specialty Welding and Turnarounds, LLC, and in support states as follows:

## I. NATURE OF THE ACTION

1. This is an action for disability discrimination, failure to accommodate, and retaliation under the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.* ("ADA").

2. Courtland Guillory survived kidney cancer. In April 2024, surgeons removed his entire left kidney along with surrounding lymph nodes to excise a malignant tumor roughly ten centimeters across. After recovering, he returned to work and continued attending the follow-up appointments that cancer survivorship requires.

3. Defendant Specialty Welding and Turnarounds, LLC ("SWAT") rehired Mr. Guillory in March 2025 as a Project Manager for its Catalyst Division. Over the next eight months

he ran projects for SWAT without a single write-up, performance improvement plan, or documented complaint about his work.

4. On November 3, 2025, Mr. Guillory told a SWAT representative in writing that he could not staff a project on a particular night because of an early-morning oncology follow-up, explaining: "I'm not sure if you are aware but I had a major kidney surgery last year so I have frequent doctor's appointments. I had kidney cancer." He forwarded the appointment confirmation from his treating urologist. He proposed two colleagues who lived near the jobsite and could cover for him.

5. Fourteen days later, SWAT fired him. The stated reason was a "reduction in force." But two weeks earlier that same SWAT representative had told Mr. Guillory the crew was short handed. SWAT continued hiring. Employees with less seniority kept their jobs.

6. In its position statement to the Equal Employment Opportunity Commission, SWAT told the agency it had "no knowledge of a disability." That statement cannot be reconciled with its own records or with the text messages exchanged on November 3, 2025.

7. Mr. Guillory brings this action to recover the wages, benefits, and other relief available under the ADA, and to hold SWAT accountable for terminating a cancer survivor because his survival required him to attend medical follow-up appointments.

## II. PARTIES

8. Plaintiff Courtland Guillory is an individual residing in Montgomery County, Texas. At all times relevant to this Complaint, Mr. Guillory was an "employee" within the meaning

of 42 U.S.C. § 12111(4) and an "individual with a disability" within the meaning of 42 U.S.C. § 12102.

9. Defendant Specialty Welding and Turnarounds, LLC is a limited liability company organized under the laws of the State of Louisiana with its principal place of business at 40492 Cannon Road, Gonzales, Louisiana 70737. SWAT may be served through its registered agent, Capitol Corporate Services, Inc., 8550 United Plaza Building II, Ste. 305, Baton Rouge, Louisiana 70809.

10. At all times relevant to this Complaint, SWAT was an "employer" within the meaning of 42 U.S.C. § 12111(5), engaged in an industry affecting commerce, and employed fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

## III. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, and under 28 U.S.C. § 1343(a)(4) because it seeks relief under Acts of Congress providing for the protection of civil rights.

12. Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3), made applicable to ADA claims by 42 U.S.C. § 12117(a), because the unlawful employment practices alleged herein were committed in this District, because the employment records relevant to those practices are maintained and administered in this District, and because SWAT maintains its principal office in this District.

13. Venue is also proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because SWAT resides in this District and because a substantial part of the events giving rise to Mr. Guillory's claims occurred here.

## IV. ADMINISTRATIVE EXHAUSTION AND CONDITIONS PRECEDENT

14. On April 15, 2026, Mr. Guillory filed a verified Charge of Discrimination with the Equal Employment Opportunity Commission, assigned Charge No. 461-2026-00689, alleging disability discrimination by SWAT. The Charge was dual-filed with the Louisiana Commission on Human Rights.

15. On May 19, 2026, the EEOC issued a Determination and Notice of Rights on Charge No. 461-2026-00689.

16. Mr. Guillory received the Determination and Notice of Rights on May 19, 2026, the same date it was issued.

17. This Complaint is filed on August 17, 2026, which is the ninetieth day following Mr. Guillory's receipt of the Determination and Notice of Rights. This action is therefore timely under 42 U.S.C. § 2000e-5(f)(1), as incorporated by 42 U.S.C. § 12117(a).

18. Mr. Guillory has satisfied all conditions precedent to bringing this action.

## V. FACTUAL ALLEGATIONS

### *A. Mr. Guillory's Record of Service to SWAT*

19. Mr. Guillory is an experienced turnaround and catalyst project manager in the downstream petrochemical industry. He first began working for SWAT in or about December 2020 and worked on SWAT projects continuously through approximately March 2024.

20. Mr. Guillory's earnings reflect the value SWAT placed on his work. SWAT reported wages to Mr. Guillory of approximately $143,012.65 for tax year 2022 and approximately $210,818.48 for tax year 2023.

21. At no point during either period of his employment did SWAT issue Mr. Guillory a written warning, place him on a performance improvement plan, or document any deficiency in his work.

***B. Mr. Guillory's Kidney Cancer, Nephrectomy, and Ongoing Surveillance***

22. On or about February 29, 2024, a CT scan revealed a mass in Mr. Guillory's left kidney measuring approximately 10 by 8.3 centimeters. Subsequent MRI imaging on or about March 6, 2024 confirmed an exophytic left renal mass measuring approximately 9.8 by 8.4 by 9.7 centimeters extending from the central kidney parenchyma into the left renal hilum.

23. On or about April 1, 2024, Mr. Guillory underwent a laparoscopic left radical nephrectomy with lymphadenectomy — the surgical removal of his entire left kidney and surrounding lymph nodes — at UT Physicians Urology, Texas Medical Center, in Houston, Texas.

24. On or about June 4, 2024, Mr. Guillory was diagnosed with malignant neoplasm of the left kidney. That diagnosis remains among his active medical problems.

25. Mr. Guillory was unable to work for approximately two months following the surgery.

26. Since the nephrectomy, Mr. Guillory has required periodic oncological and urological surveillance to monitor for recurrence and to manage the function of his one remaining

kidney. He attended such appointments on or about April 15, 2024; April 29, 2024; August 8, 2024; January 9, 2025; October 16, 2025; and November 6, 2025, among other dates.

27. Mr. Guillory's cancer and its aftermath constitute a disability within the meaning of 42 U.S.C. § 12102(1)(A) because they substantially limit one or more major life activities, including normal cell growth and the operation of his genitourinary and renal systems. *See* 42 U.S.C. § 12102(2)(B); 29 C.F.R. § 1630.2(i)(1)(ii).

28. Alternatively, Mr. Guillory has a record of such an impairment within the meaning of 42 U.S.C. § 12102(1)(B), and SWAT regarded him as having such an impairment within the meaning of 42 U.S.C. § 12102(1)(C).

29. Throughout the relevant period, Mr. Guillory was a qualified individual under 42 U.S.C. § 12111(8): he could perform the essential functions of the Project Manager position, with or without reasonable accommodation, and in fact did so.

### *C. SWAT Knew About Mr. Guillory's Cancer*

30. SWAT learned of Mr. Guillory's condition contemporaneously with his diagnosis and treatment in 2024.

31. On or about February 20, 2024, Mr. Guillory told Rodgers Thibodeaux, SWAT Vice President, by text message that his side had been hurting and that he had "some abdominal issues that requires surgery."

32. On or about February 29, 2024, Mr. Thibodeaux asked Mr. Guillory whether he was "good with insurance for your surgery," advised him to check with Holly Brumfield — a

SWAT Human Resources Supervisor – Gonzales location — regarding when his coverage would lapse, and discussed the scope of SWAT's health plan with him.

33. On or about March 15, 2024, Mr. Guillory told Mr. Thibodeaux by text message: "now I have a cancerous tumor on my left kidney I have to get removed. I have to removed [sic] the whole kidney."

34. On or about March 17, 2024, Mr. Guillory told Mr. Thibodeaux by text message that the mass measured "10 x 8cm," that physicians believed it had been present for roughly five years, and that he had already consulted with a surgeon who specialized in the procedure.

### *D. SWAT Recruits Mr. Guillory Back*

35. Following his recovery, SWAT sought Mr. Guillory out. Paul Duke, SWAT's Operations Manager, contacted Mr. Guillory about returning to the company.

36. On March 17, 2025, Mr. Duke texted Mr. Guillory that he had emailed him an offer letter and asked him to "let me know when you want to start."

37. By letter dated March 17, 2025, signed by SWAT President and COO Spencer Moak, SWAT offered Mr. Guillory the position of Project Manager for the Catalyst Division, reporting directly to Matt Peterson, Vice President of Catalyst. Mr. Guillory accepted the same day.

38. The offer letter designated Mr. Guillory a "G40" employee, guaranteeing him forty hours of pay per week for fifty-two weeks of the year at a bench rate of $62.00 per hour while actively working. It further provided a $1,000.00 monthly vehicle allowance, a $125.00 monthly

cell phone reimbursement, a company fuel card, a company credit card, a laptop, eligibility for SWAT's medical and dental plans, and eligibility for SWAT's 401(k) plan.

39. Between March 2025 and November 2025, Mr. Guillory performed work for SWAT on numerous projects. SWAT reported wages to Mr. Guillory of approximately $100,568.14 for the portion of tax year 2025 that he worked.

40. SWAT never disciplined Mr. Guillory, never counseled him about his performance, and never told him his job was in jeopardy.

### *E. The November 3, 2025 Disclosure and Accommodation Request*

41. On the evening of November 3, 2025, a SWAT representative identified in Mr. Guillory's phone as "Ricardo SWAT" (hereinafter "Ricardo") texted Mr. Guillory at 8:06 p.m.: "Good evening, Courtland. I just heard that you didn't make it to BASF Geismar project. Whats [sic] going on."

42. At 8:34 p.m., Mr. Guillory replied that he had told "Jessica" the prior week that he would not arrive until Tuesday, that he would work Tuesday night, and that he could not work Wednesday night "cause I have an early doctor's appointment on the 6th."

43. In the same message, Mr. Guillory disclosed his disability directly: "I'm not sure if you are aware but I had a major kidney surgery last year so I have frequent doctor's appointments. I had kidney cancer bro."

44. At 8:40 p.m., Mr. Guillory forwarded Ricardo a screenshot of his patient-portal appointment confirmation from MyUTHealth Houston. The confirmation identified the

department as UT Physicians Urology — Texas Medical Center, the provider as Tung Shu, M.D., and the appointment as 8:15 a.m. on November 6, 2025.

45. The request embedded in that exchange was modest: that Mr. Guillory be excused from a single night shift so that he could attend a cancer-surveillance appointment the following morning. A modified work schedule is a reasonable accommodation expressly identified by statute. 42 U.S.C. § 12111(9)(B).

46. At 8:41 p.m., Ricardo responded: "I was not awar[e]. I asked Jesica [sic] to replace you on that project. They are short handed."

47. At 8:55 p.m., Mr. Guillory volunteered solutions, identifying two colleagues — Felix Wyre and Patrick Miller — who lived near the Baton Rouge jobsite and could cover the shift. At 8:56 p.m., Ricardo replied: "No they already have two guys lined out."

48. SWAT never contacted Mr. Guillory to discuss his disclosed condition, never initiated any interactive process, never referred him to human resources, never offered him leave, and never proposed any schedule adjustment.

49. On or about November 4, 2025, Mr. Peterson contacted Mr. Guillory about another project, which Mr. Guillory accepted.

50. Mr. Guillory attended his oncology follow-up appointment as scheduled on November 6, 2025.

***F. The November 17, 2025 Termination***

51. On November 17, 2025 — fourteen days after Mr. Guillory disclosed his kidney cancer in writing and requested a schedule accommodation — SWAT terminated his employment.

52. Mr. Peterson delivered the news. In substance, Mr. Peterson told Mr. Guillory that SWAT was paying him too much money for him to be unavailable when SWAT needed him, linking the termination to Mr. Guillory's alleged unavailability immediately after his disclosed cancer-surveillance appointment.

53. Mr. Peterson also told Mr. Guillory that the separation was the result of a reduction in force.

54. The Separation Notice SWAT prepared that same day identifies the reason for separation as "Lack of Work (Reduction in Force)" and states, in the space provided to explain the reason for separation, only "ROF."

55. SWAT offered Mr. Guillory no severance. His health insurance terminated at the end of the month of his separation.

56. Word traveled inside the company. At 1:11 p.m. on November 17, 2025, a SWAT employee identified in Mr. Guillory's phone as "Gary Swat" texted him: "Hey dude it [sic] a rumor about letting you go." Mr. Guillory responded that things "weren't how it should be anyway," and Gary replied: "Believe me I know that."

57. After the termination, a SWAT employee told Mr. Guillory that the reason for his release was the number of doctor appointments and post-cancer follow-up visits he had been attending.

### *G. SWAT's Stated Reason Is Pretextual*

58. SWAT's asserted justification — a reduction in force driven by lack of work — is false, and SWAT knew it was false when it offered it.

59. Fourteen days before terminating Mr. Guillory for purported "lack of work," SWAT's own representative told him in writing that the crew on the BASF Geismar project was "short handed," and that SWAT had "two guys lined out" to fill the gap.

60. SWAT continued to hire employees after Mr. Guillory's separation.

61. Employees with less seniority than Mr. Guillory were retained after his separation.

62. SWAT had no documented performance or disciplinary basis for selecting Mr. Guillory for separation, and applied no articulated, consistent selection criteria to any purported reduction in force.

63. In its position statement submitted to the EEOC on or about May 15, 2026, SWAT asserted that "in all his time working on projects for SWAT Mr. Guillory did not inform SWAT of a disability" and that "SWAT had no knowledge of a disability or the need to accommodate a disability."

64. That assertion is demonstrably false. Mr. Guillory disclosed his kidney cancer in writing to SWAT personnel in February and March 2024, and again in writing on November 3, 2025, when he also transmitted documentary confirmation of his oncology appointment.

65. SWAT's position statement further characterized Mr. Guillory's absence during the week of November 13 through 17, 2025 as "vacation" and as being "out of the country," while simultaneously denying any awareness that his absences were medical. SWAT's explanations are internally inconsistent and shifting.

66. A reasonable factfinder could conclude, and Mr. Guillory alleges, that SWAT's stated reason is a pretext for disability discrimination and retaliation. Mr. Guillory further alleges that his disability, his record of disability, SWAT's perception of his disability, and his request for accommodation caused SWAT to terminate his employment.

## VI. CAUSES OF ACTION

### COUNT I
### Disability Discrimination in Violation of the ADA, 42 U.S.C. § 12112(a)

67. Mr. Guillory incorporates the preceding paragraphs as though fully set forth herein.

68. The ADA prohibits an employer from discriminating against a qualified individual on the basis of disability in regard to the discharge of employees and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

69. Mr. Guillory has a disability, has a record of a disability, and was regarded by SWAT as having a disability, within the meaning of 42 U.S.C. § 12102(1).

70. Mr. Guillory was a qualified individual who could perform the essential functions of the Project Manager position with or without reasonable accommodation.

71. SWAT subjected Mr. Guillory to an adverse employment action — termination of his employment — because of his disability.

72. SWAT's proffered reason for the termination is pretextual.

73. SWAT's conduct was intentional and undertaken with malice or with reckless indifference to Mr. Guillory's federally protected rights, entitling him to punitive damages under 42 U.S.C. § 1981a(b)(1).

74. As a direct and proximate result of SWAT's unlawful conduct, Mr. Guillory has suffered and continues to suffer damages as set forth below.

**COUNT II**

**Failure to Accommodate in Violation of the ADA, 42 U.S.C. § 12112(b)(5)(A)**

75. Mr. Guillory incorporates the preceding paragraphs as though fully set forth herein.

76. Discrimination under the ADA includes an employer's failure to make reasonable accommodations to the known physical limitations of an otherwise qualified individual with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business. 42 U.S.C. § 12112(b)(5)(A).

77. Mr. Guillory is a qualified individual with a disability.

78. Mr. Guillory's disability and its consequential limitations — specifically, his need to attend periodic cancer-surveillance appointments — were known to SWAT no later than November 3, 2025, when he disclosed his kidney cancer in writing and transmitted documentary confirmation of his oncology appointment.

79. Mr. Guillory requested a reasonable accommodation: a modified work schedule excusing him from a single night shift so that he could attend an early-morning medical appointment. Modified work schedules are expressly enumerated as reasonable accommodations under 42 U.S.C. § 12111(9)(B).

80. SWAT failed to provide any accommodation and failed to engage in the interactive process required to identify one. Instead of discussing the request, SWAT removed Mr. Guillory from the project and, fourteen days later, terminated him.

81. Accommodating Mr. Guillory would have imposed no undue hardship on SWAT. Mr. Guillory himself identified two available colleagues living near the jobsite, and SWAT had already, by its own account, "lined out" replacement personnel.

82. As a direct and proximate result of SWAT's failure to accommodate, Mr. Guillory has suffered and continues to suffer damages as set forth below.

**COUNT III**

**Retaliation in Violation of the ADA, 42 U.S.C. § 12203(a)**

83. Mr. Guillory incorporates the preceding paragraphs as though fully set forth herein.

84. The ADA prohibits discrimination against any individual because that individual has opposed any act or practice made unlawful by the ADA or because that individual exercised or enjoyed a right granted or protected by the ADA. 42 U.S.C. § 12203(a)-(b).

85. On November 3, 2025, Mr. Guillory engaged in protected activity by requesting a reasonable accommodation in the form of a modified work schedule after disclosing that the requested schedule change was needed because of his kidney cancer and cancer-surveillance appointment.

86. SWAT thereafter subjected Mr. Guillory to a materially adverse action by removing him from the project and terminating his employment on November 17, 2025.

87. A causal connection exists between Mr. Guillory's protected activity and his termination. The termination followed the accommodation request by fourteen days, SWAT identified no intervening performance issue, and SWAT's stated reason is contradicted by its own contemporaneous statement that the crew was short handed.

88. As a direct and proximate result of SWAT's retaliation, Mr. Guillory has suffered and continues to suffer damages as set forth below.

## VII. DAMAGES

89. As a direct and proximate result of SWAT's unlawful conduct, Mr. Guillory has suffered and continues to suffer the following damages:

a. Back pay, including lost wages, the $1,000.00 monthly vehicle allowance, the $125.00 monthly cell phone reimbursement, lost 401(k) contributions, and the value of lost medical and dental coverage, from November 17, 2025 through the date of judgment, together with prejudgment interest;

b. Front pay in lieu of reinstatement, or reinstatement, as the Court deems appropriate;

c. Out-of-pocket medical expenses incurred as a result of the loss of employer-sponsored health coverage;

d. Compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and humiliation;

e. Punitive damages;

f. Reasonable attorneys' fees, expert fees, and costs pursuant to 42 U.S.C. § 12205; and

g. Such further relief as the Court deems just.

Mr. Guillory has mitigated, and will continue to mitigate, his damages by seeking and accepting suitable employment consistent with his experience, medical condition, and professional qualifications.

## VIII. JURY DEMAND

90. Pursuant to Federal Rule of Civil Procedure 38(b) and 42 U.S.C. § 1981a(c), Mr. Guillory demands a trial by jury on all issues so triable.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Courtland Guillory respectfully requests that this Court enter judgment in his favor and against Defendant Specialty Welding and Turnarounds, LLC, and award the following relief:

a. A declaration that SWAT's conduct violated the Americans with Disabilities Act;

b. Back pay and benefits, with prejudgment interest;

c. Front pay, or reinstatement to a comparable position;

d. Compensatory damages in an amount to be determined by the jury;

e. Punitive damages in an amount to be determined by the jury;

f. Reasonable attorneys' fees, expert fees, and costs of court;

g. Post-judgment interest at the maximum rate allowed by law; and

h. All other relief, legal or equitable, to which Mr. Guillory may be justly entitled.

Respectfully submitted,

**DANIEL | WILLIAMS & ASSOCIATES, PLLC**

By: */s/ Helen Daniel*
Helen M. Daniel
h.daniel@danielwilliamslaw.com
Kathryn Y. Williams (*pro hac vice pending*)
k.williams@danielwilliamslaw.com
2201 Hermann Drive
Houston, Texas 77004-7613
Tel: (713) 229-9997
Fax: (281) 501-6777
**ATTORNEYS FOR PLAINTIFF COURTLAND GUILLORY**